LEONHARD and another, Respondents, vs. CHICAGO FIRE & MARINE INSURANCE COMPANY, Appellant.

*January 13—February 7, 1933.*

For the appellant there was a brief by *Julius O. Roehl,* and oral argument by *Harry G. Slater,* both of Milwaukee.

For the respondents there was a brief by *La Follette, Rogers & Roberts,* attorneys, and *W. Wade Boardman* of counsel, all of Madison, and oral argument by *Mr. Glenn D. Roberts* and *Mr. Boardman.*

NELSON, J. Prior to March 5, 1929, the defendant, hereafter called the company, was a corporation organized and existing under the laws of the state of Illinois. Its authorized capital stock was $1,000,000, composed of 100,000 shares of the par value of $10 each. On or about March 5, 1929, its capital stock was, after due and proper action taken by the company and its stockholders, reduced to $500,000. Thereafter certain preliminary steps were taken by the company pursuant to the laws of the state of Illinois to increase its capital stock from $500,000 to $1,000,000. Under the laws of that state an Illinois fire and marine insurance company of a stock type had no authority to increase its capital stock except upon compliance with the laws of that state and the rules and regulations of the Division of Insurance of its Department of Trade and Commerce. To increase the capital stock of such a corporation certain preliminary steps were required to be taken which included among others the following: (1) Filing with the Department of Trade and Commerce a certified declaration of intention to amend its charter, together with a copy of the proposed amended charter; (2) obtaining from the superintendent of insurance a certificate reciting that he had examined the proposed amended charter and other proofs and that the same complied with the constitution and laws of that state. After that was done a corporation was permitted to open books for subscriptions to the proposed in-

crease in capital stock. The books were required to be kept open until the full amount of the increase in capital stock was subscribed and fully paid in. A corporation was required to keep all moneys paid in on subscriptions in a special account until all preliminary proceedings for the increase in capital stock were completed. After the full amount of the increased capital had been subscribed and paid in, the superintendent of insurance was required to cause an examination of the company to be made. The examiners had to be able to certify that the full amount of the increase of the capital stock had been paid in and that the company was possessed of such money, or its equivalent in authorized stocks, bonds, and mortgages. The officers of such a corporation were then required to certify under oath that the capital exhibited to the examiners was the *bona fide* property of the corporation, and to file such certificate in the office of the superintendent of insurance. A certified copy of the amended charter might then be procured from the superintendent of insurance and be filed in the office of the clerk of the county where such corporation was located.

After the defendant company had filed with the Department of Trade and Commerce its declaration of intention to amend its charter and a copy of its proposed amended charter, and after it had obtained the required certificate from the superintendent of insurance, the company opened subscription books and offered to each of its old stockholders the right to subscribe for two shares of the new stock for each share of the old stock held by him. The subscription price was $40 per share.

At that time one Jacob L. Krings of the city of Madison was the owner of at least fifty shares of the old stock. Under the subscription rights offered, he was entitled to subscribe for one hundred shares of the new stock, which was to be issued when all of the increased stock was fully subscribed and paid for. Mr. Krings did not care to subscribe

for any of the new stock. The plaintiffs were anxious to subscribe for one hundred shares of the new stock and arrangements were made by them with Mr. Krings whereby Mr. Krings agreed to exercise his rights and subscribe for one hundred shares of the new stock for the plaintiffs. Mr. Krings signed the subscription blank sent him by the company and then either sent it to the company or permitted the plaintiffs to send it in, accompanied by a remittance of $4,000, contributed by the plaintiffs. Upon receipt of the $4,000 subscription the company sent out its so-called "Temporary Certificate—Exchangeable for Engraved Certificate When Ready for Delivery." The certificate recited that Mr. Krings was the owner of one hundred shares of "the full-paid and non-assessable capital stock" of the company and that such certificate was transferable on the books of the company. The Krings certificate, upon its receipt, was assigned to the plaintiffs and the certificate was sent in to the company to the end that new certificates, made out in the names of the plaintiffs, might be substituted therefor. The company kept the certificate issued to Mr. Krings and sent to the plaintiffs temporary certificates in lieu thereof.

Late in the fall of that year the company, not having succeeded in obtaining subscriptions for all of the proposed increase in its capital stock, and the crash in the stock market having occurred, decided not to proceed further with the attempt to increase its capital stock. It appears that the company notified nearly all of the subscribers for new stock that it would refund the moneys paid in. It refused, however, to refund to the plaintiffs the $4,000 contributed by them for the very specious reason that when Mr. Krings assigned the temporary certificate to the plaintiffs it resulted in there being outstanding more stock (obviously old stock) than the company was authorized to issue, and required the company, in order to protect itself from an illegal and unauthorized overissue of its stock, to go into the open market

and buy one hundred shares of the old stock in order to retire the same, and thus keep its outstanding stock in balance with the amount it was authorized to issue. The reasons asserted by the company for refusing to return the $4,000 to the plaintiffs are so obviously dishonest as to merit no discussion or consideration. The plaintiffs, however, evidently swallowed the explanation of the company, for shortly thereafter they delivered their certificates to local representatives of Chicago brokers for sale. The Chicago brokers disposed of plaintiffs' temporary certificates for the sum of $2,584.80 net to them. Thereafter this action was commenced to recover the sum of $1,415.20 as money had and received by the company.

That this action lies under all of the circumstances for the sum claimed gives rise to no doubt in our minds.

An action for money had and received is maintainable whenever the defendant receives money which in equity and good conscience he ought to pay to the plaintiff. *Wells v. American Express Co.* 49 Wis. 224, 229, 5 N. W. 333; *Limited Investment Asso. v. Glendale Investment Asso.* 99 Wis. 54, 59, 74 N. W. 633; *Johnston v. Charles Abresch Co.* 109 Wis. 182, 184, 85 N. W. 348; *J. V. LeClair Co. v. Rogers-Ruger Co.* 124 Wis. 44, 50, 102 N. W. 346; *Siggins v. Chicago & N. W. R. Co.* 153 Wis. 122, 125, 140 N. W. 1128; *Sheboygan County v. City of Sheboygan,* 209 Wis. 452, 245 N. W. 87. The increase of the capital stock was never authorized by the state of Illinois. At the time the company obtained the $4,000 from the plaintiffs it was merely authorized to solicit subscriptions for the proposed increase in capital stock. Upon receiving plaintiffs' money the company was required by law to keep it in a special account until all of the 100,000 shares of proposed new stock were subscribed and paid for. Failing in its efforts to float the proposed issue of new stock, it never became authorized to issue any of the new stock.

Defendant makes several contentions as to why the judgment appealed from should not. stand. It is contended (1) that the proposed increase in stock was never authorized by law; (2) that the subscription for new stock did not make Krings a stockholder; (3) that a corporation may determine at the outset who it will admit as stockholders; (4) that a subscription for unauthorized stock is void both on the ground of illegality and want of consideration; (5) that subscriptions for stock were conditional on the company's obtaining subscriptions and payment for the full amount of its proposed increase; (6) that there was no issue of stock to Krings in the first instance, or to the plaintiffs thereafter by virtue of the issue to them of the so-called temporary certificates, because the increase was never authorized and because the condition of the subscriptions, viz., that all of the increase must be subscribed, was never performed; (7) that the plaintiffs·took nothing by the assignment of the temporary certificate; and (8) that Krings, by assigning the certificate to the plaintiffs, created one hundred shares of stock in excess of the amount of stock which the company was authorized to issue, and compelled the company to go into the market and buy a like number of shares of its old and authorized stock in order to retire the excessive issue resulting from Krings' assignment.

With all of these contentions, with the exception of 7 and 8, we are in accord, but they do not in any way militate against the recovery herein. Contentions 7 and 8 are obviously inconsistent. If the plaintiffs took nothing by the purported assignment, then certainly the assignment was without effect and Mr. Krings' assignment could not have operated to bring into existence stock in excess of that authorized to be issued by the company. A further answer to defendant's contention is found in the fact that the company knew that the $4,000 which accompanied the Krings

subscription had been contributed by the plaintiffs and it offered no objection to the subscription being exercised by Krings for the plaintiffs. Obviously the company was interested in getting subscriptions to the full amount of the desired increase in its capital stock. It accepted the $4,000 and shortly thereafter changed the temporary certificate issued in the name of Krings into like certificates issued in the names of the plaintiffs. This certainly amounted to a consent by the company to the plaintiffs' subscribing. Issuing the temporary certificates to the plaintiffs in place of the one theretofore issued to Krings certainly did not change the nature of the temporary certificate or transform it into either old or unauthorized stock. When the first certificate which was issued to Mr. Krings was surrendered to the company and new ones issued to the plaintiffs in its stead, the Krings certificate was completely replaced by the plaintiffs' certificates.

The particular document which, throughout this opinion, has been referred to as a "temporary certificate" was neither such in fact nor in legal effect. It was merely a receipt evidencing the payment of $4,000 to the company for one hundred shares of stock which the company proposed to issue pursuant to the subscription when and if it was authorized so to do. The pretended assignment of the temporary certificate, which was nothing but a receipt for the money paid in, conferred no rights upon the so-called assignee. The purported assignment, coupled with the delivery of the temporary certificate, amounted to nothing but a parting with a receipt which evidenced the payment of money. When the plaintiffs attempted to assign and sell their temporary certificates no rights were thereby conferred upon the purchaser. Whether the company or another purchased plaintiffs' temporary certificates does not appear. In any event the pretended sale of plaintiffs' temporary certificates conferred no rights upon the so-called purchaser, in the absence of a contract assigning all of the plaintiffs'

interest in and to the $4,000 held in trust for them by the company. The plaintiffs, in this action, sued to recover only the sum of $1,415.20, for which amount judgment was entered in their favor. We have no doubt that they are entitled to recover that amount from the company.

*By the Court.*—Judgment affirmed.